# EXHIBIT

# 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL CARDS COMPANY, LTD., <br><br> Plaintiff, <br><br> v. <br><br> MASTERCARD INTERNATIONAL INC., <br><br> Defendant. | No. 13-CV-2576 |

Expert Report of
Anthony B. Creamer III, CPA/ABV

February 18, 2015

# CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    SUMMARY OF OPINIONS ................................................................................ 2

III.   RELEVANT PARTIES ......................................................................................... 3

       A. MasterCard International Incorporated ......................................................... 3

       B. International Cards Company, Ltd. ................................................................ 3

IV.    BACKGROUND .................................................................................................... 4

       A. The MasterCard-ICC Relationship ............................................................... 4

       B. MasterCard Becomes Aware of Complaints Against ICC ............................ 4

       C. Termination of ICC's Membership and Related License Agreements ........... 5

       D. Recovery Against Collateral ......................................................................... 6

V.     DAMAGES ............................................................................................................. 7

       A. Out-of-Pocket Costs Incurred by MasterCard Addressing ICC's Misconduct ........... 9

       B. Lost Fees from Banks Refusing to Become MasterCard Members ................. 13

       C. MasterCard's Annual Lost Fees on ICC Cardholder and Merchant Transactions ........ 14

VI.    CONCLUSIONS ................................................................................................... 19

VII.   SIGNATURE ........................................................................................................ 20

| | |
|---|---|
| **Exhibit A** | Resume of Anthony B. Creamer III |
| **Exhibit B** | Documents Considered |
| **Exhibit C** | Travel-Related Expenses Incurred to Address ICC's Misconduct |
| **Exhibit D** | Lost Member Fees from Banks Refusing to Become New MasterCard Members |
| **Exhibits E.1-2** | Lost Issuing Fees |
| **Exhibit F** | Lost Acquiring Fees |

## I.      INTRODUCTION

Navigant Consulting was engaged by Ballard Spahr LLP ("Counsel") on behalf of MasterCard International Incorporated ("MasterCard") to perform various financial analyses of damages suffered by MasterCard as a result of International Cards Company, Ltd.'s ("ICC") misconduct.  It is my understanding that MasterCard terminated ICC's membership and related license agreements due to ICC's breaches of contract including its failure to make timely payments to merchants and improper use of MasterCard trademarks and servicemarks (ICC's "misconduct").  I have been asked to review documents produced in this litigation matter and deposition transcripts and to interview MasterCard personnel to determine which costs and lost revenues are attributable to ICC's misconduct and to quantify those damages.  This report presents my findings and opinions on certain types and amounts of financial damage MasterCard has suffered as a result of ICC's misconduct.  I have not attempted to quantify certain of the losses sustained by MasterCard as a result of ICC's misconduct.  In addition, I am not expressing any opinions as to the legal recoverability by MasterCard of any of the losses discussed herein or that MasterCard may otherwise assert.

I am a Managing Director at Navigant Consulting, Inc. ("Navigant"), a specialized independent business and litigation consulting firm. Navigant employs over 2,000 professionals operating from offices located in the United States and abroad.  Navigant's consultants are experienced in accounting, economics, statistics, finance and other business disciplines.  My curriculum vitae is presented in Exhibit A.  Other professionals at Navigant who worked on this matter did so under my direction.

For the services I have rendered in this matter, Navigant is compensated at a rate of $790 per hour. Professionals working under my direction have billing rates that range from $290 to $635 per hour. Fees for our services are not contingent in any manner upon the opinions rendered or the outcome of this matter.

In reaching my opinions, I relied upon my training, education and professional experience (including multiple services to a major credit card company), various documents and deposition transcripts produced in this litigation, other documents obtained in the course of my work, as well as interviews of MasterCard personnel, as set forth in Exhibit B.

The opinions and analyses presented in this report are based on currently available information together with the facts that I have been asked to assume, which are summarized below.  At trial,

selected pages of the documents and information relied upon may be used as exhibits. Additionally, I may prepare graphical or illustrative exhibits based on the contents of this report, the documents and information relied upon and my analysis of the documents and information.  This matter and my review of financial materials are ongoing. Should new information become available, I may amend or supplement this report as necessary.

## II.    SUMMARY OF OPINIONS

My opinions, expressed to a reasonable degree of professional certainty, are as follows:

**Out-of-Pocket Costs:**

- ICC's misconduct caused MasterCard to incur multiple out-of-pocket expenses to address and mitigate the impact of ICC's misconduct on MasterCard's brand and on-going operations in the Levant.[1]

- The total travel-related expenses incurred by MasterCard Levant team personnel amounted to ███████

- The total increased advertising and marketing expenditures directly related to efforts to address impacts of ICC's misconduct in Jordan amounted to ███████

- Total out-of-pocket costs incurred by MasterCard to address ICC's misconduct amounted to ███████

**Lost Fixed Member Fees:**

- MasterCard suffered damages related to lost fixed fees that it would have earned from banks in the Levant region that refused to become new MasterCard's members due to ICC's misconduct. Those lost member fees amounted to ███████ from 2010 through 2014 (though they continue past 2014).  I have not calculated or included the lost volume-based fees that MasterCard would have earned on transactions made by the potential cardholders of the banks that refused to become new members of MasterCard due to ICC's misconduct.

**Lost Fees on Cardholder and Merchant Activity:**

- ICC's misconduct caused MasterCard to lose volume-based fees on transactions made by former ICC cardholders and merchants beginning in 2013.  Lost issuing volume fees amounted to ███████ over three years and alternatively, ███████ over five years.  Lost acquiring volume fees

---

[1] MasterCard's Levant region includes Jordan, Lebanon, Palestine, Syria and Iraq.

amounted to ████████   Together, total lost transaction fees amounted to ████████ over three years and alternatively, ████████ over five years.

**Total Damages:**

- In total, the combined damages to MasterCard as a result of ICC's misconduct for out-of-pocket expenses, lost fixed member fees from banks that refused to become new members of MasterCard and lost volume-based fees on cardholder and merchant activity amounted to ████████ with lost issuing volume fees over three years and alternatively, ████████ with issuing volume fees over five years.

## III.   RELEVANT PARTIES

### A.  MasterCard International Incorporated

MasterCard is a wholly-owned subsidiary of MasterCard Incorporated. MasterCard is a technology company in the global payments industry that facilitates the use of electronic forms of payment.  MasterCard processes, clears and settles payment transactions and provides other payment related services across 210 countries and territories in 150 different currencies. MasterCard uses several well-known brands including MasterCard, Maestro and Cirrus to differentiate its product offerings from competitors.  MasterCard enters into membership-related agreements with financial institutions to grant certain rights, including access to the MasterCard network, and the rights to issue payment cards and acquire MasterCard-branded card transactions.[2]

### B.  International Cards Company, Ltd

ICC is a financial services company that currently trades on the Amman Stock Exchange under the symbol "CARD."  ICC was formed in 1999 with operations located in Amman, Jordan.  ICC was granted MasterCard membership and related licenses to issue MasterCard-branded payment cards and acquire MasterCard-branded payment card transactions from merchants from December 1999 until April 2013.

---

[2] MasterCard International, December 31, 2013 Form 10-K, Bates M0129221-5.

Highly Confidential

## IV.   BACKGROUND

This section of my report summarizes facts I have been asked by Counsel to assume for purposes of this report.

### A.   The MasterCard-ICC Relationship

ICC's application to become a MasterCard member was preliminarily approved on December 23, 1999.  Final approval followed shortly thereafter on April 2, 2000.  With final approval, ICC became a principal member of MasterCard and was granted related MasterCard brand licenses. ICC's MasterCard membership and related non-exclusive licenses authorized ICC to issue MasterCard-branded cards and provide acquirer-related payment services to Jordanian merchants that would accept MasterCard-branded cards for payments at their points of sale. MasterCard granted ICC a license to use the "MasterCard Electronic" brand mark on April 1, 2002.  MasterCard granted ICC a license for acquiring activities under the Maestro mark (for debit cards) in Jordan in June, 2003.  In November 2010, MasterCard granted ICC a license to issue and acquire in Palestine.  However, ICC never reported any activity in Palestine, despite the fact that ICC issued MasterCard-branded cards in Palestine through Palestinian-based Quds Bank.[3]

Throughout its history as a member of the MasterCard network, ICC was a net acquirer of MasterCard-branded card transactions.  ICC did issue MasterCard-branded cards and pre-paid cards for its own customers and for several banks in Jordan, but its acquiring activity from merchants that had agreed to process MasterCard-branded credit card payments through ICC exceeded the value of purchases made by cards issued through ICC.[4]  From a cash management perspective this meant that ICC was a net recipient of cash from MasterCard's network to pay merchants when transactions were processed.

### B.   MasterCard Becomes Aware of Complaints Against ICC

Although MasterCard had encountered some problems with ICC during the first ten years of its membership, in 2010 MasterCard began hearing complaints from merchants regarding delays by ICC in remitting payments for transactions acquired by ICC.  Despite having no

---

[3] Quarterly Member Report ("QMR"), Annual 2009 to Q3 2014, Bates M0128999.  MasterCard produces QMR reports summarizing periodic cardholder and merchant activity based on statistics and transaction data that has been provided by and reconciled with individual member companies.
[4] QMR, Annual 2009 to Q3 2014, Bates M0128999.

Highly Confidential

contractual relationship with MasterCard, Jordanian merchants contacted MasterCard in Dubai out of frustration with a lack of responsiveness from ICC and out of confusion due to ICC's misuse of the MasterCard brand.[5]  ICC often represented itself as MasterCard and many merchants came to believe that ICC and MasterCard were one and the same.  Merchants complained to MasterCard that ICC had been late with payments for processed transactions, had not paid them at all and had refused to respond to their complaints.  MasterCard became aware that, as a result of their frustration, merchants in Jordan were refusing to accept MasterCard-branded cards and had begun posting anti-MasterCard signs in their storefronts and on their point of sale terminals.

From 2010 until the first quarter of 2013, MasterCard attempted to investigate and resolve the merchant complaints through interaction with ICC's management and requests for additional data from ICC regarding the merchant complaints of which it was aware.[6]  In 2012, MasterCard also commissioned a satisfaction survey of merchants in Jordan.  That survey revealed that the problems with ICC's delayed settlement times were more widespread and that Jordanian merchants held a significantly lower opinion of ICC in multiple respects by comparison to the other MasterCard acquirer in Jordan (Middle East Payment Services, Co., "MEPS") and the VISA acquirer in Jordan (Emerging Market Payments Group, "EMP").[7]  While MasterCard attempted to work with ICC to ascertain and address the problems with ICC's payment delays, MasterCard also took actions to mitigate the damage to its brand and network through outreach to other banking institutions in the Levant and through broader enhanced marketing activities in 2013.[8]

### C.  Termination of ICC's Membership and Related License Agreements

MasterCard terminated ICC's membership and related license agreements on April 2, 2013 due to ICC's continuing failure to address the payment issues giving rise to merchant and customer complaints and damaging MasterCard's brand and operations in the Levant.[9]  Upon

---

[5] MasterCard International Incorporated's Answer and Counterclaims and Demand for Jury Trial filed September 13, 2013, paragraph 45, page 27.
[6] Interviews of Basel El Tell.
[7] Leading Point Merchant Satisfaction Survey for MasterCard, Final Report July 2012, Bates M0129175.
[8] Interviews of Basel El Tell.
[9] MasterCard International Incorporated's Answer and Counterclaims and Demand for Jury Trial filed September 13, 2013, paragraph 49, page 28.

Highly Confidential

terminating ICC, MasterCard lost ▇▇▇▇ MasterCard-branded cards issued through ICC[10] and approximately ▇▇▇ merchants[11] who had accepted MasterCard-branded cards through ICC. Due to ICC's misconduct, many of these cardholders and merchants were dissuaded or prevented from obtaining a new MasterCard-branded card or reaching an agreement to accept MasterCard-branded cards for transactions that would be acquired by the other MasterCard acquirer in Jordan. Correspondingly, MasterCard lost the transaction revenue associated with the purchasing and acquiring activity from these cards in the months and years that followed.

### D. Recovery Against Collateral

The MasterCard Rules give MasterCard the right to "collect from the Customer, in addition to any amount otherwise due and payable by the Customer to [MasterCard] or to other Customers, such additional amount from Customer as [MasterCard] deems appropriate as collateral."[12]  The MasterCard Rules further provide that if MasterCard takes collateral, MasterCard "has the right, *as it deems necessary and appropriate,* to take ownership of such collateral … and to *apply such collateral as payment toward any obligations of the Customer to [MasterCard] or otherwise owed by the Customer under the Standards.*"[13]  The MasterCard Rules therefore give MasterCard the right to apply the ICC collateral as payment toward any obligations that ICC owes either to MasterCard or elsewhere under the Standards.[14]

MasterCard Rule 5.2.4 requires that "[e]ach Acquirer must pay each Merchant for all Transactions the Acquirer acquires from the Merchant in accordance with the Merchant Agreement and the Standards.  *This obligation is not discharged with regard to a Transaction until the Merchant receives payment from the Acquirer that acquired the Transaction…*"[15]

The MasterCard Rules contain an indemnification clause that provides, *inter alia,* that "[e]ach Customer … must protect, indemnify, and hold harmless [MasterCard] … from any … loss, cost, liability and/or expense … resulting from and/or arising in connection with, any act or

---

[10] QMR, Annual 2009 to Q3 2014, 19,274 as of December 31, 2012, Bates M0128999.
[11] Interviews of Basel El Tell.
[12] MasterCard Rules at § 2.4, Bates M0066821.
[13] Id. (emphasis added), Bates M0066822.
[14] Id. at page 9.  The MasterCard Standards include the "Amended and Restated Certificate of Incorporation, Bylaws , Rules, and policies, and the operating regulations and procedures of [MasterCard], including but not limited to any manuals, guides or bulletins, as may be amended from time to time", Bates M0066807.
[15] Id. at § 5.2.4 (emphasis added), Bates M0066871.

Highly Confidential

omission of the Indemnifying Customer … with respect to, or relating to … [t]he compliance or non-compliance with the Standards by the Indemnifying Customer."[16]

I have been instructed by Counsel to assume that:

- ICC was rightfully terminated and that MasterCard is holding ICC's collateral as partial compensation for the damages described in my report and to cover potential amounts still owed merchants.

- ICC's termination was MasterCard's only reasonable business judgment given MasterCard's damaged image and conditions in Jordan caused by ICC's misconduct.

- MasterCard terminated ICC to mitigate the much larger and longer-term damages MasterCard faced from a deteriorating brand image and customer base in Jordan that would have resulted from ICC's continuing misconduct.

Based on these assumptions I have calculated damages to MasterCard that represent the short term cost to mitigate additional long term damage to the Company's brand, reputation and goodwill or, in the case of lost fixed fees, as a direct result of ICC's misconduct.  This economic loss as presented should not be improperly construed or interpreted as representing the effect of MasterCard's termination of ICC.

## V.   DAMAGES

MasterCard's business depends on a widely-held positive perception of its brands and confidence in the integrity of its payment processing network.

"Our brands and their attributes are key assets of our business. The ability to attract and retain cardholders to our branded products depends highly upon the external perception of us and our industry."[17]

---

[16] Id. at § 3.3, Bates M0066842.
[17] MasterCard International, December 31, 2013 Form 10-K, Bates M0129255.

Highly Confidential

"Our brands, principally MasterCard, are valuable strategic assets that drive acceptance and usage of our products and facilitate our ability to successfully introduce new service offerings and access new markets globally."[18]

Because MasterCard's business depends, among other things, on a global network of cardholders, merchants, banks, other companies in the payment processing chain and a uniform use of the trademarks that signify the brand, local harm to MasterCard's reputation can cause broader damage to MasterCard's brand that ripples across the network and is hard to repair.

Among the damages MasterCard has suffered as a result of ICC's misconduct are three broad categories that are quantified in this report. The first category includes those out-of-pocket costs incurred by MasterCard to mitigate the negative impact of ICC's misconduct on the MasterCard brand in the Levant. The second category includes losses MasterCard sustained when Jordanian banks refused to become MasterCard members because of the negative perception of MasterCard caused by ICC's misconduct and the potential for cardholder dissatisfaction with the MasterCard brand which significantly impacted acceptance of MasterCard-branded cards in Jordan. The third category includes the fees that MasterCard would have otherwise collected on the transactions made by former ICC cardholders of MasterCard-branded cards and merchants who would have established new MasterCard-branded accounts following MasterCard's termination of ICC's membership and related licensing agreements but for the damage that ICC's misconduct inflicted upon the MasterCard brand. MasterCard also suffered additional damages due to the diversion of personnel resources which are described herein but are not quantified.

For each of these categories I have limited the quantum of damages to those attributable to ICC's misconduct as described above. I have considered and made adjustments for any alternative, unrelated factors that influenced MasterCard's actual costs and business results given ICC's misconduct. All of the damage calculations presented in this report are expressed in nominal terms and have not been discounted based on a risk-adjusted discount rate specific to MasterCard to reflect the value as of the date of ICC's breaches. I have also not calculated pre-judgment interest that may be applicable to the discounted values of damages as of the dates of ICC's misconduct to the date of award. I am prepared to provide these discounting and pre-judgment interest calculations at the time of trial.

---

[18] MasterCard International, December 31, 2013 Form 10-K, Bates M0129285.

Highly Confidential

### A.   Out-of-Pocket Costs Incurred by MasterCard Addressing ICC's Misconduct

#### 1. MasterCard Personnel Travel-Related Expenses

The offices from which MasterCard operates its Levant business are located in Dubai, United Arab Emirates.  MasterCard personnel commonly travel to countries in the Levant to manage relationships with member entities and work to expand the network of member entities on both the card issuing and acquiring sides.  MasterCard also employs a person who lives and works in Jordan. During the period prior to MasterCard's termination of ICC's membership and related license agreements and immediately thereafter, a portion of MasterCard's regional travel was conducted specifically to address ICC's misconduct.  Pre-termination travel was taken to investigate and attempt to put a halt to ICC's delayed settlements and non-payment of merchants by ICC.  Post-termination travel was taken to attempt to repair the damage that ICC's misconduct had inflicted upon the MasterCard brand and to hasten the recovery of MasterCard operations with merchants, banks, and cardholders.[19]  For example, in November 2012, members of the MasterCard Levant team traveled to Jordan and met with ICC to discuss complaints that MasterCard was receiving from ICC cardholders and merchants, as well as ICC's plans to remedy their operational issues.[20] MasterCard also met with ████████████████████████████████████ ████████████████████████████████  during the November 2012 trip to Jordan to address ICC's misconduct that was affecting the Jordan market.[21]  These travel expenses represented an incremental increase over the expenses MasterCard would have incurred were it not for ICC's misconduct.

MasterCard identified all such travel and related expenses incurred in the period from 2012 through 2013 where at least a portion of the travel was undertaken to counteract or mitigate damage caused by ICC's misconduct.  These gross expenses amounted to ██████ and are identified in Exhibit C.  For each staff member, MasterCard also identified the portion of these travel expenses that

---

[19] Interviews of Basel El Tell.
[20] Beena Pothen November 19, 2014 deposition transcript page 159.
[21] Id. pages 45-52.

Highly Confidential

were specifically tied to addressing ICC's misconduct.  Referencing these portions, I have eliminated all travel expenses not related to addressing ICC's misconduct or the brand damages caused by ICC's misconduct. These allocations are also shown in Exhibit C.[22]  After excluding the unrelated portions of trips that also addressed ICC's misconduct, the net out-of-pocket cost to MasterCard for travel to address ICC's misconduct is ███████ as shown in Exhibit C.

## 2. MasterCard Advertising and Marketing Expenditures

MasterCard routinely engaged in advertising and marketing ("A&M") activities in both Jordan and Lebanon to maintain and expand its network.  These activities have included print ads, billboards and media engagements.[23] MasterCard was forced to increase its 2013 A&M expenditures above otherwise expected levels in order to counter and mitigate damage to the MasterCard brand and network caused by ICC's misconduct.[24]

a.  Jordan

Prior to recognizing the need to counter and mitigate ICC-caused brand damage, MasterCard expected A&M expenditures to increase in Jordan by approximately ██████ each year, consistent with the expected overall rate of growth in MasterCard's Levant business.[25]  In 2012 MasterCard spent ████████ on A&M in Jordan including ██████ for the merchant satisfaction survey commissioned by MasterCard noted above.  Excluding the ██████ survey cost, 2012 Jordan A&M costs were ███████.  A ██████ increase over this 2012 amount equals ████████ MasterCard's actual A&M spend in 2013 amounted to ███████ or approximately ███████ greater than otherwise expected in 2013 absent the need to counteract and mitigate the damage ICC inflicted upon the MasterCard brand.[26]  This ██████ increase, when

---

[22] Interviews of Basel El Tell.
[23] Interviews of Basel El Tell.
[24] Interviews of Basel El Tell. Deposition of Basel El Tell, November 6, 2014, pages 595-596 and 638-639. MasterCard A&M expenditures summary, Bates M0129024.
[25] Interviews of Basel El Tell.
[26] MasterCard Advertising & Marketing Spend – Deposition Exhibit 215, Bates M0127165-6.

Highly Confidential

combined with the ███████ spent on the satisfaction survey in 2012, results in total increased A&M expenses in Jordan amounting to ███████.

b.  Lebanon

MasterCard also incurred A&M expenses in Lebanon as a direct result of ICC's misconduct. ████████████████████████████████████ ██████████████████████████████████████ ███████ The Lebanese and Jordanian financial and payment card systems are closely connected in the minds of consumers and industry participants alike. Major Lebanese banks, including BLOM Bank, Bank Audi, and CreditCard Services Company (owned by CSCBank Lebanon), also operate in Jordan.[27] There is a substantial amount of tourism between the two countries, resulting in significant cross-border activity as customers of these and other Lebanese banks frequently travel to Jordan.[28]  Any perceived disruptions in MasterCard's network could jeopardize MasterCard's existing relationships with the Lebanese banks resulting in diminished investments by the banks in expanding the use of MasterCard-branded cards.[29]  Further, negative perceptions by Lebanese MasterCard-branded cardholders regarding the willingness of Jordanian merchants to accept MasterCard-branded cards would be a disincentive to the selection of a new MasterCard-branded card or the use of an existing MasterCard-branded card when traveling in Jordan.[30]  Approximately ███████ of MasterCard's ███████ A&M spend in 2013 in Lebanon[31] was directly related to addressing damage to the MasterCard brand within the Lebanese market caused by ICC's misconduct in Jordan.[32]

---

[27] Interviews of Basel El Tell and QMR, Annual 2009 to Q3 2014, Bates M0128999.
[28] Interviews of Basel El Tell.
[29] Interviews of Basel El Tell.
[30] Interviews of Basel El Tell.
[31] MasterCard A&M expenditures summary, Bates M0129024
[32] Interviews of Basel El Tell.

11

Highly Confidential

### 3. MasterCard's Additional Damages

MasterCard suffered additional damages as a result of the diversion of MasterCard resources to address ICC's misconduct and the negative perception of MasterCard's brand attributable to ICC's misconduct.  MasterCard's Levant team operates from offices in Dubai, United Arab Emirates consisting of three full-time employees and multiple shared employees.[33]  MasterCard's Levant team also had personnel outside of Dubai, including in Jordan itself.  MasterCard's Levant team managed existing and prospective relationships with multiple entities in Jordan and the rest of the Levant.[34] ███████████

████████████████████████████████████████████

███████████████████████████████[35]  As noted previously, MasterCard's Levant team personnel spent a significant portion of their time in 2012 through 2014 addressing the exceptional ICC-related issues.  This time diverted personnel resources that could otherwise have been used to improve MasterCard's operations and relationships with other, existing entities and expand the network of issuers and acquirers in the Levant, both of which would have increased MasterCard's revenues and profitability.  Since specific lost opportunities cannot be attributed to ICC-related uses of time, I have not quantified a point estimate of the quantum of damages related to the diversion of MasterCard personnel.  However, across a portfolio of relationships and on-going business development activities, the diversion of market-facing resources is reasonably expected to result in losses for MasterCard.

### 4. Total Increased or Redirected Costs Incurred by MasterCard Addressing ICC Misconduct

As set forth above, MasterCard incurred increased or redirected costs due to ICC's misconduct for travel, advertising and marketing costs in Jordan and Lebanon.  The table below summarizes the total costs incurred by MasterCard in its efforts to address and remedy ICC misconduct:

---

[33] Interviews of Basel El Tell.
[34] QMR, Annual 2009 to Q3 2014, Bates M0128999. Interviews of Basel El Tell.
[35] Interviews of Basel El Tell.

Highly Confidential

---

**MASTERCARD'S INCREASED OR REDIRECTED
COSTS TO ADDRESS ICC-RELATED ISSUES**

| Category | Amount |
|---|---|
| Travel-Related Expenses | ▇ |
| Advertising and Marketing | |
| Jordan | ▇ |
| Lebanon | ▇ |
| **Total** | ▇ |

---

### B.  Lost Fees from Banks Refusing to Become MasterCard Members

MasterCard has continued to develop its network of relationships in Jordan and the Levant since before ICC became a member to the present.  MasterCard became aware in 2010 that its efforts to expand its network in Jordan were being impeded by Jordanian banks' concerns over ICC's failure to pay merchants and the poor perception of the MasterCard brands that such failures had created.[36]  The impact of these concerns is demonstrated by the success MasterCard has experienced attracting new banks in Jordan once ICC was terminated and the associated merchant payment issues were cured.

Prior to 2013, three banks operating in Jordan did not become MasterCard member banks for reasons reportedly related to ICC's failure to pay merchants and damage to the MasterCard brand.[37]  During MasterCard's continuing interactions with potential MasterCard member banks, these three banks repeatedly pointed to the failures to pay merchants in Jordan and specifically to ICC as the reason why they would not agree to become a member of MasterCard.[38]  Of these three banks, one has only recently reached an agreement with MasterCard to begin issuing MasterCard-branded cards, having gained comfort that the merchant payment and brand image issues caused by ICC's misconduct that thwarted earlier negotiations have been addressed.  Two of these banks continue to have no member status with MasterCard.[39]

---

[36] Interviews of Basel El Tell.
[37] Interviews of Basel El Tell.
[38] Interviews of Basel El Tell.
[39] Interviews of Basel El Tell.

Highly Confidential

Each MasterCard member pays certain periodic fixed fees to be a part of MasterCard's network and remain eligible to issue MasterCard-branded cards.  These fees include quarterly issuing and acquiring assessments, monthly systems connectivity assessments and Interbank Card Association fees for check clearing.  I have estimated the total of these lost periodic fixed fees over the period from 2010 (when banks' concerns over ICC's processing became more pointed) to either 1) the time that the bank became an affiliate or principal member of MasterCard or 2) the end of 2014 for the two banks that remain unaffiliated with MasterCard (though damages related to these two banks continues as of the date of my report).  The detailed calculation of the lost fees for each bank is shown in Exhibit D.  I have also excluded the lost volume- and transaction-based fees that MasterCard should have received on the card activity that would have taken place had these bank began issuing MasterCard-branded cards in 2010.  These volume and transactions fees would exceed the fixed fees calculated in Exhibit D.  In total, MasterCard's lost fixed fees from the three banks amounted to ███████ through 2014.[40]

## C.   MasterCard's Annual Lost Fees on ICC Cardholder and Merchant Transactions

As noted above, I have been asked to assume that MasterCard was forced to terminate ICC's membership and related license agreements because of ICC's misconduct.  This action was taken in order to mitigate continuing damage to MasterCard's brand, reputation and goodwill.  I have come to understand that this action caused short term losses to MasterCard when cardholders and merchants were immediately unable to use or accept MasterCard-branded cards, but helped prevent additional long term damage to MasterCard.  I have been requested to quantify the economic cost of mitigation.

In my estimation, the most appropriate proxy for quantifying this cost is assuming these cardholders and merchants would have been retained through a different company. As such my presentation is based on an evaluation of lost MasterCard-branded cards issued by ICC and lost merchants who accepted MasterCard-branded cards in Jordan and Palestine through ICC's acquiring network.

Both the purchase activity by cardholders and sales activity by merchants had generated transaction fees for MasterCard for domestic (within Jordan) and cross-border activity.

---

[40] Based on my understanding of MasterCard's operations and the fees assessed member companies, these lost fixed member fees would not be associated with significant incremental costs.  Further I have excluded volume-based and periodic reporting fees that would vary with customers' use of MasterCard's systems and cover any incremental costs.

Highly Confidential

MasterCard earned different fees depending on the exact nature of the activity.  MasterCard would have continued to receive these fees from the ICC portfolio of cardholders and merchants through new arrangements with other MasterCard affiliates after the termination of ICC's membership and related license agreements if the cardholders', merchants' and banks' opinions of MasterCard had not been tarnished by ICC's failure to pay its merchants.  These lost MasterCard fees are limited to those that are a function of cardholder and merchant activity and excludes the member fees ICC previously paid to MasterCard.[41]

### 1.  Lost Fees on Cardholders' Issuing Activity

At the time MasterCard terminated ICC's membership and related license agreements, ICC had reported ▮▮▮▮ MasterCard-branded cards issued and outstanding to cardholders in Jordan.[42]  In 2012, the calendar year immediately preceding termination, ICC-issued cardholders purchased a combined volume of approximately ▮▮▮▮▮ in ▮▮▮▮ ransactions.[43]  These cardholders and transactions were divided between consumer, commercial and prepaid cards, and between domestic and international transactions.  However, since 2009 ICC's portfolio of cardholders and merchants had been generating a declining level of activity measured in both volume and transactions.  The four-year history of ICC-issued cards purchase activity is summarized in Exhibit E.1 for volumes and Exhibit E.2 for transactions.  From 2009 to 2012, the total volume of this activity changed at a compound annual growth rate (CAGR) of negative 6.1% (i.e., decreased at an annual rate of 6.1%).  Transaction counts experienced a CAGR of negative 3.3%.

To illustrate MasterCard's lost fees on this issuing activity, I first estimated twelve months of purchase activity ending March 2014 (the first twelve months after ICC's termination) by referencing the last four calendar quarters of activity ending March 2013 and applying the CAGRs calculated for each detailed

---

[41] Similar to the lost fixed member fees described earlier, these lost volume-based fees would not be associated with significant incremental costs.  I have excluded both the fixed member fees and the periodic reporting fees that would vary with customers' use of MasterCard's systems and cover any incremental costs.

[42] QMR, Annual 2009 to Q3 2014, 19,274 as of December 31, 2012, Bates M0128999.

[43] QMR, Annual 2009 to Q3 2014, $27.2 million in Gross Dollar Volume and 177,041 in Gross Transactions as of December 31, 2012, Bates M0128999.

Highly Confidential

category of volumes and transactions as reflected in Exhibits E.1 and E.2.  Using this methodology I have been conservative and extended the pattern of ICC's declining business into the next twelve months following ICC's termination.

I then applied the fee rates that MasterCard received for each category of transactions as of the time of ICC's termination.  MasterCard received fees based on both the volume of transactions and on the total number of transactions.  In total, annualized estimated lost issuing activity fees MasterCard would have received on ICC-issued MasterCard-branded credit cards amounted to ███, as reflected in Exhibit E.2.

When these ICC-issued cardholders lost the use of their MasterCard-branded cards, they were forced to either forego a replacement card or find an alternative for a new card.  Any new card would have to be either a non-MasterCard branded card from the same issuing bank, or one from a choice of brands of cards from other banks in Jordan.  In 2013 VISA had a commanding market presence in Jordan (VISA's annual purchase volume was approximately nine times the size of MasterCard's) and ████████████████████████ ████.[44]  VISA continues to lead MasterCard by a wide margin in market share.[45]  Any former MasterCard-branded cardholder actively looking for alternative cards would find far more offers for VISA cards than MasterCard-branded cards in Jordan and thus be more likely to switch to a VISA-branded card.

There are compounding industry factors that make it difficult for MasterCard to expand its portfolio of member banks and card issuers in Jordan.  License agreements with banks typically cover a three to five year period and commonly create an exclusive arrangement under which the bank will only issue one brand card.[46]  Agreements with banks that offer better potential for adding cardholders and merchants typically include incentive arrangements that make the

---

[44] Leading Point Merchant Satisfaction Survey for MasterCard, Final Report July 2012, Bates M0129175, and Market Share – MasterCard v Visa 2012 to 2014, Bates M0129019.
[45] MasterCard Market Share – MasterCard v Visa 2012 to 2014, Bates M0129019.
[46] MasterCard seldom enters into agreements with banks for less than three years and five year agreements are common. Interviews of Basel El Tell.

Highly Confidential

relationship more durable.[47]  In addition, customized technology systems represent a significant infrastructure cost for banks and the complex interaction of these systems represents a significant switching cost.  The combination of these industry factors and ███████████████████████████████ ████████████████████████████████████████████████ ███████████ and thus the loss of ICC cardholders that will persist over three to five years.[48]  Extending MasterCard's estimated annual lost issuing fees over this range results in losses of ████████ or ████████ for three- or five-year durations, respectively.  My review regarding the persistence of lost ICC-issued MasterCard branded cards is ongoing and I reserve the right to update my report accordingly as I receive additional information and reach further conclusions.

## 2. Lost Fees on Merchant Acquiring Activity

As of the date MasterCard terminated ICC's membership and related license agreements, ICC had established arrangements to process and acquire MasterCard-branded cards' transactions with approximately 6,000 merchants in Jordan.[49]  In 2012, ICC acquired approximately ████████████ in MasterCard purchases in Jordan over ██████ transactions.[50]  This merchant activity was predominantly purchase transactions, but also included a small number of cash transactions.  Similar to the issuing activity described above, the acquiring activity was divided between domestic and international transactions.  The four year history of ICC acquiring activity is summarized in Exhibit F.  From 2009 to 2012, the total volume of this activity declined, changing at a CAGR of negative 5.32%.

To calculate MasterCard's lost fees on this acquiring activity, I first estimated twelve months of purchase activity ending March 2014 (the first twelve months after ICC's termination) by referencing the last four calendar quarters of activity

---

[47] Interviews of Basel El Tell.
[48] Interviews of Basel El Tell.
[49] Interviews of Basel El Tell.
[50] QMR, Annual 2009 to 2012, excerpt for ICC's $56.7 million in Gross Acquiring Volume and 374,807 in Gross Acquiring Transactions as of December 31, 2012, Bates M0129006-7.

Highly Confidential

17

ending March 2013 and applying the CAGRs calculated for each detailed category of volumes and transactions as reflected in Exhibit F.

Similar to the calculations for issuing transactions, I then applied the fee rates that MasterCard received for each category of acquiring transactions as of the time of ICC's termination.  Again, MasterCard received fees based both on the purchase volume of transactions and on the count of transactions.  In total, annualized estimated lost acquiring activity fees MasterCard would have received from ICC merchants accepting MasterCard-branded credit card purchases amounted to ███████, as reflected in Exhibit F.  Total fees lost from both issuing and acquiring activity amounts to ███████ over three years and alternatively, ███████ over five years as shown in the below chart.



**MASTERCARD'S LOST FEES FROM ISSUING AND ACQUIRING ACTIVITY**

| Category | Issuing Fees Over Three Years | Issuing Fees Over Five Years |
|---|---|---|
| Issuing Activity | ███ | ███ |
| Acquiring Activity | ████ | █████ |
| **Total** | █ ███ | █████ |

Highly Confidential

## VI.   CONCLUSIONS

**Out-of-Pocket Costs:**

- ICC's misconduct caused MasterCard to incur multiple out-of-pocket expenses to address and mitigate the impact of ICC's misconduct on MasterCard's brand and on-going operations in the Levant.

- The total travel-related expenses incurred by MasterCard Levant team personnel amounted to ██████.

- The total increased advertising and marketing expenditures directly related to efforts to address impacts of ICC's misconduct in Jordan amounted to ██████.

- Total out-of-pocket costs incurred by MasterCard to address ICC's misconduct amounted to ██████.

**Lost Fixed Member Fees:**

- MasterCard suffered damages related to lost fixed fees that it would have earned from banks in the Levant region that refused to become new MasterCard's members due to ICC's misconduct. Those lost member fees amounted to ██████ from 2010 through 2014 (though they continue past 2014). I have not calculated or included the lost volume-based fees that MasterCard would have earned on transactions made by the potential cardholders of the banks that refused to become new members of MasterCard due to ICC's misconduct.

**Lost Fees on Cardholder and Merchant Activity:**

- ICC's misconduct caused MasterCard to lose volume-based fees on transactions made by former ICC cardholders and merchants beginning in 2013. Lost issuing volume fees amounted to ██████ over three years and alternatively, ██████ over five years. Lost acquiring volume fees amounted to ██████. Together, total lost transaction fees amounted to ██████ over three years and alternatively, ██████ over five years.

Highly Confidential

**Total Damages:**

- In total, the combined damages to MasterCard as a result of ICC's misconduct for out-of-pocket expenses, lost fixed member fees from banks that refused to become new members of MasterCard and lost volume-based fees on cardholder and merchant activity amounted to ███████ with lost issuing volume fees over three years and alternatively, ███████ with issuing volume fees over five years, as shown in the chart below.

### CALCULATION OF TOTAL DAMAGES TO MASTERCARD

| Category | Amount |
|---|---|
| Travel-Related Expenses | ███ |
| Advertising and Marketing | ███ |
| New Member Fees | ███ |
| Lost Acquiring Fees | ███ |
| **Sub-total, Damages before Lost Issuing Fees** | ███ |

| | Issuing Fees Over Three Years | Issuing Fees Over Five Years |
|---|---|---|
| Lost Issuing Fees | ███ | ███ |
| **Total Damages** | ███ | ███ |

## VII.   SIGNATURE

NAVIGANT CONSULTING, INC.

By: _Anthony B. Creamer III signature_

Anthony B. Creamer III, CPA/ABV

Highly Confidential



# Anthony B. Creamer III, CPA

**Professional History**
- Navigant Consulting, Inc.
  2002 to present
- Arthur Andersen LLP
  1978 to 2002

**Education**
- M.B.A.   Drexel University
- B.S.      Bloomsburg University

**Professional Associations**
- American Institute of Certified Public Accountants
- Pennsylvania Institute of Certified Public Accountants

**Certifications**
- Certified Public Accountant*
- Certified Fraud Examiner
- Certified in Financial Forensics by the American Institute of Certified Public Accountants
- ABV (Accredited in Business Valuation by the American Institute of Certified Public Accountants)

Mr. Creamer is a Managing Director at Navigant Consulting, specializing in litigation, dispute analysis and financial investigations services.  He has been practicing as a *Certified Public Accountant* (CPA) since 1980.  He is also *Accredited in Business Valuation* (ABV) and *Certified in Financial Forensics* (CFF) by the American Institute of Certified Accountants.

## Professional Experience

Throughout his career, Mr. Creamer has performed special investigations, financial audits, purchase and due diligence investigations, corporate recovery and reorganization consulting, regulatory studies, cost accounting studies, and internal control and security reviews.  His clients have included public and private companies in banking and financial markets, real estate development, consumer products, health care, insurance and reinsurance, manufacturing, pharmaceuticals, professional services and telecommunications.

In the area of dispute analysis assignments, engagements have included complex liability assessment, fact gathering, financial data analysis, causation determination and economic damages computations in the context of among other things: antitrust, breach of fiduciary duty, false advertising, franchising, fraud, insurance and reinsurance, lender liability, minority shareholder disputes, post acquisition disputes, professional malpractice, securities class action and theft of trade secrets.

In the area of special investigations, Mr. Creamer has worked on behalf of audit committees, special committees of boards and management in a range of accounting practices investigations.

Mr. Creamer has served as a sole arbitrator and party arbitrator.

Mr. Creamer has served as a guest lecturer at Drexel University and the Wharton School (Executive Continuing Education Branch).

*\* Licensed in Pennsylvania only. Neither Mr. Creamer nor Navigant Consulting provide audit, attest or public accounting services, in this or any other state*

Highly Confidential



Anthony B. Creamer III, CPA

## Professional and Civic Organizations

Mr. Creamer has been involved in professional standard-setting (1984-1986), serving as the Secretary of the International Federation of Accountants, the global organization of the accounting profession in over 100 countries. Mr. Creamer served two years on the Council of Pennsylvania Institute of Certified Public Accountants (PICPA).  Mr. Creamer is a member of the American and Pennsylvania Institutes of Certified Public Accountants.  He is a past president of the Philadelphia Chapter of the Institute of Management Accountants (formerly National Association of Accountants).

Board Service includes the following: American Composers Orchestra (2012-Present), Committee of Seventy (1992-2009), Cunningham Dance Foundation (1995-2013), Curtis Institute of Music (2012-Present), Pennsylvania Innocence Project (2009- Present), Philadelphia Bar Foundation (1998-2004)

## Presentations

Mr. Creamer has given presentations to groups such as PICPA, National Institute for Trial Advocacy, Pennsylvania Bar Institute and the American Bar Association.

## Publications

"What to know when Signing a 10-K" (with Marc S. Gerber), Magazine – *NACD Directorship | Boardroom Intelligence*, September 2011.

"Greater Scrutiny on Fair Value in Financial Reporting" *The Legal Intelligencer* – October 2012.

"M&A Season:  What to Expect, and Are You Ready?" *NACD Directorship*, January/February 2013.

"Fair Value Accounting:  Reinforcing Organizational Transparency and Accountability"
(with Jay A. Dubow),  *Business Law Today*, April 2013.

## Testimony in Deposition or Court

Mr. Creamer has provided expert testimony in Federal courts; courts in Pennsylvania, New Jersey Chancery, Delaware Chancery, and California; the American Arbitration Association; the International Court of Arbitration of the International Chamber of Commerce.  He has been qualified in courts as a CPA, forensic and cost accountant, business valuation and damages assessment expert.

The following is a list of cases in which Mr. Creamer has testified:

» In the *United States District Court for the District of Delaware*, Compaq Computer Corp. v. Packard Bell Electronics, Inc.; Packard Bell Electronics, Inc. v. Compaq Computer Corp. and Ross Cooley (Civil Actions No. 95-222-RRM and 95-607-RRM Consolidated).

» In *American Arbitration Association*, ARAMARK and National Park Service (File 16-114-00083-94).

Highly Confidential



**Anthony B. Creamer III, CPA**

» In the *Commonwealth Court of Pennsylvania*, Pennsylvania Human Relations Commission, v. School District of Philadelphia, and Harry and Annemarie Gwynne, Aspira of Pennsylvania, v. Commonwealth of Pennsylvania, Thomas J. Ridge, Governor of the Commonwealth of Pennsylvania, the City of Philadelphia and Edward Rendell, Mayor of the City of Philadelphia (No. 1056 C.D. 1973).

» In the *International Chamber of Commerce, International Court of Arbitration*, Seton Company v. Silveroak Industries Limited (Case No. 8971/FMS).

» In the *United States District Court for the Eastern District of Pennsylvania*, Joseph H. Giuffrida v. American Family Brands, Inc.; American Family Brands, Inc. v. Giuffrida Enterprises, Inc., et al. (Civil Actions No. 96-CV-7062 and 96-CV-7256 Consolidated).

» In the *Superior Court of New Jersey, Gloucester County, Chancery Division*, Susan Vosbikian, Individually as the Executrix of the Estate of James T. Vosbikian, v. Jack Vosbikian, International Rollforms, Inc. and Vosbikian Realty Associates (Civil Action, Docket No. GLO-C-000095-94).

» In *American Arbitration Association*, James E. Winner and Donna C. Winner, h/w v. Robert E. Hankey, GPW Two, Inc., The Aspen Group, Inc. and 6100 N. 17th Street, (Civil Action No. 97-CV-3526).

» In *American Arbitration Association*, Claridge at Park Place, Inc. v. Perini/Nugent Joint Venture (AAA No. 18-Y-110-00398-97) consolidated with a matter in arbitration Perini/Nugent Joint Venture v. Central Metals, Inc.

» In the *Court of Chancery for the State of Delaware*, HMG/Courtland Properties, Inc. v. Lee Gray, Martine Avenue Associates, Norman A Fieber, NAF Associates, Betsy Gray Saffell, and James A. Fieber (Civil Action 15789 NC).

» In the *Superior Court of New Jersey, Chancery Division, Middlesex County*, Direct Communications, Inc. v. AWACS, Inc., d/b/a Comcast Metrophone, et al. (Docket No. C-125-99).

» In the *Court of Common Pleas of Bucks County*, Marvin Steinberg v. Conic Corporation, Lockheed Martin Microcom Corporation, Lockheed Martin Conic, Lockheed Martin Corporation, L3 Communications Corporation and L3 Communications Holding, Inc. (Civil Action (Civil Action 97008934 22-1).

» In the *Superior Court of the State of California for the County of Orange*, The Bengard Group, Inc. (formerly Trim Master, Inc.), et al. v. Trim Master, Inc. (formerly Trim Master Co.), et al. and Trim Master, Inc. (formerly Trim Master Co.) v. The Bengard Group, Inc. (formerly Trim Master, Inc.), et al. (Case No. 797567).

Highly Confidential



Anthony B. Creamer III, CPA

» In the *Court of Common Pleas, First Judicial District of Pennsylvania, Civil Trial Division,* Pioneer Commercial Funding Corporation and Bank One, Texas, N.A. v. American Financial Mortgage Corporation, Thomas F. Flatley, Norwest Funding, Inc. and CoreStates Bank, N.A. (Case No. 0885).

» In the *Court of Common Pleas of Montgomery County, Pennsylvania*, in re: W.W. Smith Charitable Trust under Will of William Wikoff Smith, Deceased.

» In the *United States District Court for the District of Delaware*, CP Kelco U.S., Inc. v. Pharmacia Corporation v. Lehman Brothers Merchant Banking Partners II, L.P. Hercules Incorporated, and Hercules 2000, LLC (Civil Action 01-240-RRM).

» In the Matter of Arbitration between Sompo Japanese Insurance Inc. (successor to The Nissan Fire & Marine Insurance Co., Ltd.) (Petitioner) and Fortress Re, Inc. (Respondent).

» In the Matter of Arbitration between Fortress Re, Inc. (Petitioner) and Aioi Insurance Co., Ltd. (Respondent).

» In the *United States District Court for the Eastern District of Virginia, Alexandria Division*, Cellco Partnership d/b/a Verizon Wireless v. Nextel Communications, Inc. (Civil Action No. 03-839-A).

» In the *United States District Court for the District of New Jersey*, Bracco Diagnostics Inc., a Delaware corporation, v. Bergen Brunswig Drug Company, Inc., a California corporation (Civil Action No. 3:01cv5777).

» In the *Court of Common Pleas Dauphin County, Pennsylvania*, Douglas R. Colkitt, M.D. and Oncology Services Corporation v. Dechert Price & Rhoads (Civil Action - Law No. 729-S-95).

» In the *Court of Common Pleas of Susquehanna County*, Wilprint Marketing Consultants, Ltd., Inc., C. Richard Lee and Joel M. Levy, Plaintiffs v. Wachovia Bank, Successor by Merger to First Union Bank, Successor by Merger to CoreStates Bank, N.A., Successor by Merger to Meridian Bank and Commonwealth Bank, and Jeffrey Dobbin, Defendants (Civil Action - Law 1998-170 C.P.).

» In the *United States District Court for the Central District of California Southern Division*, The Consulting Group, Inc., a California Corporation, Plaintiff, v. Cingular Wireless LLC, a Delaware limited liability corporation, Defendant; Cingular Wireless LLC, a Delaware Limited Liability Company, Counterclaimant, v. The Consulting Group, Inc., a California Corporation, Counterclaim Defendant (Case No.: SACV 03-109 DOC (MLGx)).

» In the Matter of Arbitration between Oncura, Inc. (successor to Medi-Physics, Inc., d/b/a Nycomed Amersham Imaging) (Claimant) v. Theragenics Corporation (Respondent).

» In the *Superior Court of the State of Delaware, New Castle County* Matter of Cendant Corporation v. Commonwealth General Corporation (Case No.:98C-10-034(CHT))

Page 4

Highly Confidential



**Anthony B. Creamer III, CPA**

»   In the *American Arbitration Association, New York,* Matter of Continental AG v. Motorola, Inc. (Case No. 50 489 T 0017407)

»   In the *United States District Court, District of Connecticut,* RBC Nice Bearings, Inc. and Roller Bearing Company of America et. al., v. SKF USA Inc. (Case No.: 3:06-CV- 1880)

»   In the *United States District Court, District of Maryland,* Securities and Exchange Commission v. SBM Investment Certificates, Inc., f/k/a 1st Atlantic Guaranty Corp., SBM Certificate Company, Geneva Capital Partners, LLC, and Eric M. Westbury

»   In the *Court of Common Pleas Montgomery County Pennsylvania,* George Branca v. Denis James Lawler and Blank Rome LLP (re: Cactus Integration Group) (Case No. 02-12014)

»   In the *United States District Court, Middle District of Pennsylvania,* Gentex Corporation v. Brad Sutter, Patrick Walko, BAE Systems Aerospace & Defense Group, Inc., BAE Systems AH Inc. and BAE Systems Specialty Defense Systems of Pennsylvania, Inc. (Case No. 07-CV-1269)

»   In the *United States District Court, Eastern District of Pennsylvania,* Pure Earth, Inc. v. Gregory W. Call; Gregory W. Call v. Pure Earth, Inc., Mark Alsentzer and Brent Kopenhaver. (Case No. 2:09-cv-04174-LLD)

»   In the *United States Bankruptcy Court for the District of Delaware,* Ultimate Escapes Holding, LLC., et al., Post-Confirmation Debtors; Edward T. Gavin, Trustee of the UE Liquidating Trust, on behalf of the Estates of Ultimate Escapes Holdings, LLC, et al., Plaintiff v. James M. Tousignant and Richard Keith, Defendants. (Case No. 10-12915)

»   In the *Supreme Court of the State of New York, County of New York,* Zohar CDO 2003-1 Limited and Zohar II 2005-1 Limited v. Xinhua Sports & Entertainment Limited, Loretta Fredy Bush, and Andrew Chang (Index No. 651473/2011)

Highly Confidential

**MasterCard International Incorporated**
**Documents Considered**

| Document Name | Bates |
|---|---|
| 1 | MasterCard Advertising & Marketing Spend - Deposition Exhibit 215 | M0127165-6 |
| 2 | Travel receipts detail for Basel El Tell | M0129405-45 |
| 3 | Travel receipts detail for Youssef Khanachat | M0129460-70 |
| 4 | Travel receipts detail for Eyad Musharbash | M0129452-9 |
| 5 | Travel receipts detail for Beena Pothen | M0129446-51 |
| 6 | International Cards Company Second Amended Complaint - August 20, 2013 | |
| 7 | MasterCard International Incorporated's Answer and Counterclaims - September 13, 2013 | |
| 8 | MasterCard International, December 31, 2013 Form 10-K | M0129216-383 |
| 9 | Leading Point Merchant Satisfaction Survey for MasterCard, Final Report July 2012 | M0129164-99 |
| 10 | MasterCard - Understanding Pricing and Interchange - 2015 | M0129027-131 |
| 11 | MasterCard Information Request | M0129009-24 |
| 12 | MasterCard Quarterly Member Report (QMR) - Annual Data - 2009 to Q3 2014 | M0128999 |
| 13 | MasterCard Issuing and Acquiring Revenue Estimates | M0129004-5 |
| 14 | QMR Excerpts for Processed Acquiring and Gross Transactions | M0129006-8 |
| 15 | MasterCard QMR - Quarterly Data - Issuer - Q2 2011 to Q1 2013 | M0129025 |
| 16 | MasterCard QMR - Quarterly Data - Acquirer - Q2 2011 to Q1 2013 | M0128998 |
| 17 | Depositions of Basel El Tell | |
| 18 | Depositions of Khalil Alami | |
| 19 | Deposition of Beena Pothen | |
| 20 | Depositions of Waleed Al Naser | |
| 21 | Deposition of Raghu Malhotra | |
| 22 | Deposition of Haitham Said | |
| 23 | Interview of Basel El Tell | |
| 24 | Interview of Khaled Mahdy | |
| 25 | Sample of Customer Business Agreement | M0129200-13 |
| 26 | List of MasterCard Principal and Affiliate Members in Jordan | M0129214 |
| 27 | Schedule of Fees by Bank | M0129215 |
| 28 | MasterCard Rules | M0066779-7140 |
| 29 | Acquiring and Issuing Volumes | M0128988-97 |
| 30 | MasterCard Revenue from ICC 2011-2013 | M0129026 |
| 31 | MasterCard Follow-Up Information Requests | M0129000-3 |
| 32 | MEPS Alliance Agreement | M0129132-163 |
| 33 | MasterCard Personnel Costs | M0129384-6 |
| 34 | MasterCard Travel Expenses | M0129387-90 |
| 35 | MasterCard Information Request | M0129391-401 |
| 36 | MasterCard Travel Expenses | M0129402-4 |
| 37 | MasterCard Travel Expenses | M0129471-75 |
| 38 | MasterCard QMR Excerpt for Purchase and Cash Volume | M0129478-9 |
| 39 | MasterCard Expense Allocations | M0129476-7 |

Exhibit C

MasterCard International Incorporated
Travel-Related Expenses Incurred to Address ICC's Misconduct



| Individual | Number of Trips | Identified Expenses | Allocation to ICC[1] | Damages to MasterCard |
|---|---|---|---|---|
| Basel El Tell | 11 | | 40% | |
| Youssef Khanachat | 3 | | 80% | |
| Eyad Musharbash | 2 | | 50% | |
| Beena Pothen | 1 | | 50% | |
| **Total** | | | | |
| **Rounded** | | | | |

Notes

1. Allocation to ICC was determined based on interviews with Basel El Tell regarding the amount of effort required by the noted individuals.

**Source:** Receipts provided by MasterCard, Bates M0129405-43, M0129460-70, M0129452-9, and M0129446-51.

Highly Confidential

**MasterCard International Incorporated**
**Lost Fees From Banks Refusing to Become New MasterCard Members**

| Period | Fee [1] | | | | Total |
|--------|---------|---|---|---|-------|
| 2010 | Issuing | ███ | ███ | ███ | ███ |
| | Acquiring | | | | - |
| | Connectivity | | | | |
| | ICA Maintenance | ███ | ███ | ███ | |
| 2011 | Issuing | ███ | ███ | ███ | ███ |
| | Acquiring | | | | - |
| | Connectivity | | | | - |
| | ICA Maintenance | ███ | ███ | ███ | |
| 2012 | Issuing | ███ | ███ | ███ | ███ |
| | Acquiring | ███ | ███ | ███ | ███ |
| | Connectivity | ███ | ███ | ███ | ███ |
| | ICA Maintenance | ███ | ███ | ███ | ███ |
| 2013 | Issuing | ███ | ███ | ███ | ███ |
| | Acquiring | █ | ███ | ███ | ███ |
| | Connectivity | ███ | ███ | ███ | ███ |
| | ICA Maintenance | ███ | ███ | ███ | ███ |
| 2014 | Issuing | ███ | | ███ | ███ |
| | Acquiring | ███ | | ███ | ███ |
| | Connectivity | ███ | | ███ | ███ |
| | ICA Maintenance | ███ | | ███ | ███ |
| | **Total** | ███ | ███ | ███ | ███ |
| | **Rounded** | | | | ███ |

Notes

1. **Issuing** fees were introduced in 2009 and are ███ per quarter for principal members that issue cards.
   **Acquiring** fees were introduced in October 2012 and are ███ per quarter for principal members that acquire cards.
   **Connectivity** fees were also introduced in October 2012 and are ███ per month for every direct connection or ███ per month for an indirect connection.
   **ICA Maintenance** fees are ███ per quarter per active connection. In April 2014, the ICA fee was increased to ███ per quarter per active connection.
2. For ███████████████, fees associated with principal membership are still being lost through the date of this report despite the schedule stopping at 2014.
3. ███████ became an affiliate member of MasterCard through a third party in Q4 2013. Although MasterCard charges a higher fee for principal members compared to affiliates, no losses for the difference in fees is shown.
4. For ███████ fees associated with principal membership are still being lost through the date of this report despite the schedule stopping at 2014.

**Source:** Interviews with Basel El Tell, Schedule of Fees by Bank, Bates M0129215 and  MasterCard - Understanding Pricing and Interchange - 2015, Bates M0129027-131.

**MasterCard International Incorporated**
**Lost Issuing Fees - Volume**



**Notes**

1. Issuing gross domestic volumes are charged ▮ basis points, the lowest tier assessment.
2. Issuing gross international volumes are charged ▮ basis points with a supplemental ▮ basis points.

**Source:** MasterCard QMR Annual 2009 to 2012, Bates M0128999, QMR Quarterly Q2 2012 to Q1 2013, Bates M0129025, and
MasterCard - Understanding Pricing and Interchange - 2015, Bates M0129027-131.

**MasterCard International Incorporated**
**Lost Issuing Fees - Transactions**



**Notes**

1. Domestic purchase transactions are assessed a ▮▮ charge per transaction while cash transactions are assessed a ▮▮ charge per transaction.
   For 2012, ICC had a ▮▮ purchase volume and ▮▮ cash volume. A weighted average rate of ▮▮ has been used to determine fees.

2. International purchase transactions are assessed a ▮▮ charge per transaction while cash transactions are assessed a ▮▮ charge per transaction.
   For 2012, ICC had a ▮▮ purchase volume and ▮▮ cash volume. A weighted average rate of ▮▮ has been used to determine fees.

**Source:** MasterCard QMR Annual 2009 to 2012, Bates M0128999, QMR Quarterly Q2 2012 to Q1 2013, Bates M0129025, MasterCard QMR Excerpt for Annual Purchase and
Cash Volume, Bates M0129478-9 and MasterCard - Understanding Pricing and Interchange - 2015, Bates M0129027-131.

Exhibit F

MasterCard International Incorporated
Lost Acquiring Fees



| | 2009 | 2010 | 2011 | 2012 | 2009-2012 CAGR |
|---|---|---|---|---|---|
| **Acquiring Gross Volumes** | | | | | |
| Domestic | | | | | |
| International | | | | | |
| **Combined Gross Volume** | | | | | |
| **Acquiring Gross Transactions** | | | | | |
| Domestic | | | | | |
| International | | | | | |
| **Combined Gross Transactions** | | | | | |

| | Q2 2012 | Q3 2012 | Q4 2012 | Q1 2013 | TTM March 2013 | Years to End of Forecast | Growth to Forecast Period | Estimated Lost Activity | MasterCard Fees | MasterCard Fees - Total Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| **Acquiring Gross Purchase Volumes** | | | | | | | | | | |
| Domestic | | | | | | | | | | |
| International | | | | | | | | | | |
| **Combined Gross Purchase Volumes** | | | | | | | | | | |
| **Acquiring Gross Transactions** | | | | | | | | | | |
| Domestic | | | | | | | | | | |
| International | | | | | | | | | | |
| **Combined Gross Transactions** | | | | | | | | | | |

Total Annualized Lost Acquiring Fees

Rounded

**Notes**

1. Acquiring gross domestic volumes are charged a ▮ basis points, the lowest tier.
2. Acquiring gross international volumes are charged a ▮ basis points plus a supplemental ▮ basis points.
3. Acquiring gross domestic transactions are charged a ▮ switch fee for transactions less than ▮ plus a ▮ clearing fee per transaction.
   QMR evidence suggests the average domestic transaction is in excess of ▮, which carries a ▮ switch fee. A conservative fee estimate has been applied.
4. Acquiring gross international transactions are charged a ▮ switch fee for transactions less than ▮ plus a ▮ clearing fee per transaction.
   QMR evidence suggests the average international transaction is in excess of ▮ which carries a ▮ switch fee. A conservative fee estimate has been applied.

Highly Confidential

Source: MasterCard QMR Annual 2009 to 2012, Bates M0128999, QMR Quarterly Q2 2012 to Q1 2013, Bates M0128998, MasterCard - Understanding Pricing and Interchange - 2015, Bates M0129027-131, and MasterCard QMR Excerpt for Annual Processed Acquiring Volume (2009 to 2012), Bates M0129006-8.