UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
INTERNATIONAL CARDS COMPANY, LTD., :
                               Plaintiff, :
: 13 Civ. 2576 (LGS)
          -against- :
: **OPINION AND ORDER**
MASTERCARD INTERNATIONAL INC., :
                               Defendant. :
:
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

        International Cards Company, Ltd. ("ICC") brought suit against MasterCard International Inc. ("MasterCard") over MasterCard's April 2013 termination of ICC's license to issue, acquire and process credit cards in Jordan. ICC alleges that MasterCard's termination breached the parties' licensing agreements. MasterCard asserts counterclaims, alleging that ICC breached the parties' agreements by failing to make timely payments to merchants. Both parties move to exclude expert testimony under Federal Rule of Evidence 702. MasterCard also moves for summary judgment as to damages on ICC's breach of contract claim. For the following reasons, MasterCard's motions are granted in part and denied in part, and ICC's motion to exclude is denied.

**I.    BACKGROUND**

        Familiarity with the underlying allegations and procedural history is assumed. *See Int'l Cards Co. v. MasterCard Int'l Inc.*, No. 13 Civ. 2576, 2016 WL 3039891, at *1–*3 (S.D.N.Y. May 26, 2016). New York contract law applies. *Id.* at *1.

        MasterCard challenges the testimony and report of ICC's proposed damages expert, Pamela O'Neill. O'Neill opines that MasterCard's termination of the licensing agreements resulted in two kinds of damages: "Base Business" damages and "Diverted Business" damages.

The Base Business refers to ICC's operations associated with its licensing agreements with MasterCard. O'Neill avers that, due to MasterCard's termination, ICC's Base Business ceased operating, which resulted in $30.7 million in damages. This figure represents the lost going concern value of the Base Business. O'Neill used two methodologies to value the Base Business: the discounted cash flow method and the guideline company method. The Diverted Business refers to the business opportunities that ICC was actively pursuing but did not realize because of MasterCard's (1) termination of the licensing agreements and (2) allegedly unfair business practices that impacted ICC's reputation in the market. O'Neill opines that the Diverted Business damages equal $45.3 million, applying the discounted cash flow method.

ICC challenges the testimony and report of MasterCard's industry expert, Kaushik Gopal, and counterclaims damages expert, Anthony Creamer. Gopal's report covers (1) MasterCard's four-party electronic payments system, (2) the payment card industry's systems and practices in the Middle East and (3) ICC's merchant payment practices as compared to industry practices, including the impact of ICC's alleged conduct on MasterCard's four-party system. Creamer is MasterCard's counterclaims damages expert. His report calculates damages he attributes to ICC's alleged breach of contract. He estimates three types of damages: (1) the out-of-pocket costs associated with minimizing the negative impact of ICC's breach, (2) lost fees from banks that refused to become members of MasterCard's four-party system and (3) lost fees from ICC cardholder and merchant transactions.

## II. STANDARD

Summary judgment is appropriate where the record before the Court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the nonmoving party. *See id*. at 255. When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (internal quotation marks and citation omitted).

> Rule 702 governs the admissibility of expert testimony. The rule provides that:
>
> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if[] (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Courts play a "gatekeeping" role within the Rule 702 framework and are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Examination of an expert's analysis should be "rigorous," but "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* at 267.

## III. DISCUSSION

### A. Summary Judgment on ICC's Breach of Contract Claim

MasterCard moves for summary judgment on ICC's breach of contract claim. MasterCard's motion is granted as to damages that O'Neill categorizes as (1) "Additional Issuing/Acquiring Opportunit[ies]" damages and (2) "Additional Third Party Processing Opportunit[ites]" damages that relate to InvestBank and Jordan Commercial Bank. Mastercard's motion is denied as to damages that O'Neill categorizes as (1) Base Business damages, (2) "Additional Third Party Processing Opportunity" damages related to Quds Bank and (3) "ATM Operations Opportunity" damages.

#### 1. Base Business Damages

Summary judgment is denied to the extent ICC seeks Base Business damages because there is a genuine factual dispute as to whether the Base Business damages were caused by the contract termination. "Causation is an essential element of damages in a breach of contract action . . . ." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (applying New York law). "[A] plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Id.* (emphasis omitted). ICC has adduced evidence that it had enrolled 7,000 to 8,000 merchants into the MasterCard system and processed over 600,000 merchant transactions annually when MasterCard terminated its membership and license agreements. ICC has also adduced evidence that it was functioning until its termination and would have continued to do so but for MasterCard's alleged wrongdoing. Without its MasterCard membership and licenses, ICC could no longer conduct its Base Business of issuing credit cards, processing charge transactions and acquiring MasterCard transactions from

4

merchants. Based on the evidence, a reasonable jury could find that MasterCard's termination of the licensing agreements caused the Base Business damages.

MasterCard's competing evidence does not compel summary judgment in its favor. MasterCard contends that the Base Business damages improperly include $14 million in card balances owed by ICC's CEO, Khalil Alami, and his family members and that ICC cannot prove that the termination of ICC's membership caused any non-payment of these insider-owed amounts. While MasterCard's evidence regarding the Alami family card balances may impugn the amount of the damages, that evidence creates a factual issue that should be resolved at trial.

### 2. Diverted Business Damages – Potential Dealings with Other Credit Card Companies

Summary judgment is granted as to some but not all Diverted Business damages. One category -- which O'Neill categorizes as "Additional Issuing/Acquiring Opportunit[ies]" -- comprises $30.5 million in lost profits related to ICC's post-termination failure to secure the right to offer issuing and acquiring services for credit card companies other than MasterCard, such as Visa. ICC has not proffered sufficient evidence from which a reasonable jury could conclude that ICC is entitled to damages for its unrealized dealings with other credit card companies, which are consequential damages.

New York contract law distinguishes between two kinds of damages, general and consequential. *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) (applying New York law); *see also Biotronik A.G. v. Conor Medsystems Ir., Ltd.*, 11 N.E.3d 676, 679–80 (N.Y. 2014). "[W]hen the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (citing *Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989)). By contrast, consequential damages

5

"seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld*, 218 F.3d at 176. "Lost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are the direct and immediate fruits of the contract." *Biotronik A.G.*, 11 N.E.3d at 680 (internal quotation marks and citation omitted). "[D]amages that reflect a loss of profits on collateral business arrangements" are consequential. *Id.* (internal quotation marks and citation omitted).

Consequential damages are recoverable if a plaintiff demonstrates "with certainty that the damages have been caused by the breach," that "the extent of the loss is capable of proof with reasonable certainty" and that "the damages were fairly within the contemplation of the parties." *Tractebel Energy Mktg.*, 487 F.3d at 109. These are "stringent requirements." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332 (2d Cir. 1993).

ICC's alleged losses stemming from its failed efforts to work with other credit companies are consequential. These unrealized business arrangements are collateral to the licensing agreements and ICC's membership in MasterCard's global electronic payment system. ICC has submitted no evidence that a contract with Visa or another credit card company was the "direct and immediate fruits" of its agreements with MasterCard. *Biotronik A.G.*, 11 N.E.3d at 680.

Summary judgment is granted barring these consequential damages, which equal $30.5 million, because ICC has failed to adduce any evidence that MasterCard's liability for these damages was fairly within the parties' contemplation. *See Tractebel Energy Mktg.*, 487 F.3d at 109. Where, as here, the parties do not cite any contractual provision governing consequential damages, "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known

6

by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously.'" *Schonfeld*, 218 F.3d at 172 (quoting *Kenford Co. v. Cty. of Erie*, 537 N.E.2d 176, 179 (N.Y. 1989)). ICC fails to cite any direct evidence that MasterCard consciously assumed liability for ICC's potential business dealings with other credit card companies.

ICC argues that MasterCard must have been aware that ICC would pursue other issuing and acquiring opportunities because the licensing agreements were non-exclusive. However, even if MasterCard knew that ICC was free to work with other credit card companies, that does not mean that MasterCard intended to assume liability if ICC was unable to do so. *See Trademark Research Corp.*, 995 F.2d at 334. The fact that ICC could contract with one of MasterCard's competitors, without more, does not create a genuine factual dispute that MasterCard agreed to "underwrite" the $30.5 million in lost profits that ICC asserts it could have earned from working with these other companies. *Id.* (quoting *Goodstein Constr. Corp. v. City of New York*, 604 N.E.2d 1356, 1362 (N.Y. 1992)); *see Kenford Co.*, 537 N.E.2d at 179–80 ("Although the [defendant] was aware that [the plaintiff] had acquired and intended to further acquire peripheral lands, this knowledge, in and of itself, is insufficient, as a matter of law, to impose liability on the [defendant] for the loss of anticipated appreciation in the value of those lands since the [defendant] never contemplated at the time of the contract's execution that it assumed legal responsibility for these damages upon a breach of the contract.").

### 3. Diverted Business Damages – MasterCard-Related Business

The other two types of Diverted Business damages relate to ICC's alleged inability to expand its MasterCard-related business after termination. "Additional Third-Party Processing Opportunit[ies]" refer to losses attributable to ICC's inability to derive processing revenue from three banks, (1) InvestBank, (2) Jordan Commercial Bank and (3) Quds Bank. "ATM

7

Operations Opportunity" relates to ICC's inability to establish an ATM network.

Summary judgment is granted as to damages from unrealized processing revenue from InvestBank and Jordan Commercial Bank because ICC has failed to adduce evidence from which a reasonable jury could find that the April 2013 termination caused those damages. Citing O'Neill's report, ICC argues that "these opportunities were lost the moment MasterCard terminated ICC's licenses and membership." O'Neill's report, however, does not support this contention. O'Neill avers that these two opportunities were diverted *before* the termination of the licensing agreements and estimated resulting damages for 2011 and 2012, which was before the April 2013 termination. Her report does not even claim that the termination caused the damages. Further, ICC's only contention is that the termination itself led to these opportunities being lost. It does not argue that these damages are recoverable under any other theory or claim, including the previously dismissed claim for breach of the covenant of good faith and fair dealing. Accordingly, ICC cannot recover damages related to InvestBank and Jordan Commercial Bank because, contrary to its argument, it fails to create a genuine factual dispute that the 2013 termination caused these two banks to abandon the processing agreements with ICC.

Summary judgment is denied as to the damages associated with ICC's alleged dealings with Quds Bank. For Quds Bank, ICC agreed to issue MasterCard-branded credit cards to Quds Bank's clients and convert Quds Bank's debit cards and ATMs to MasterCard-branded cards and ATMs. O'Neill indicates that ICC had 30,000 cards delivered to it and that Quds Bank was ready to convert 50 ATMs when MasterCard terminated ICC's licensing agreements. MasterCard's own expert acknowledges that ICC issued MasterCard-branded cards through Quds Bank. As such, ICC has shown a genuine factual dispute that the termination prevented

ICC from deriving processing revenue from Quds Bank.

To the extent that MasterCard argues that the additional processing fees from issuing banks, like Quds Bank, are consequential damages not within the contemplation of the parties, that argument is rejected, as issuing MasterCard credit and debit cards was an integral part of the agreements between the parties.

Summary judgment is also denied for the damages related to the ATM network. The 2010 License Agreement grants ICC a license to use MasterCard's marks in connection with ICC's "MasterCard-, Maestro- or Cirrus-branded (as applicable) . . . automated-teller machine program" in Jordan and Palestine. In its termination letter, MasterCard instructed ICC that it must "stop performing MasterCard, Cirrus, and Maestro card transactions at ATMs." Based on this evidence, a reasonable jury could conclude that ICC bargained for the right to use MasterCard's marks for an ATM network and that the termination -- which expressly prevented ICC from continuing ATM transactions -- denied it the benefit of this bargain. There exists a genuine dispute whether liability for the ATM network was within the contemplation of the parties. *See Safka Holdings LLC v. iPlay, Inc.*, 42 F. Supp. 3d 488, 494 (S.D.N.Y. 2013) ("[W]here the license to use the [Defendant's] trademarks represented the principal form of consideration furnished by Defendant under the License Agreement, there can be no question that the parties contemplated Defendant's liability for denying Plaintiff the very thing it had bargained for." (citing *Schonfeld*, 218 F.3d at 177)). There also exists a genuine dispute about causation. Although MasterCard argues that ICC had not taken any steps towards launching an ATM network, O'Neill cites ICC's capital expenditures that would support starting its ATM operations and that suggest the network would have been viable. Drawing all inferences in favor of ICC, a reasonable jury could conclude that ICC would have been able to operate MasterCard-

related ATMs but for the termination.

MasterCard also argues that summary judgment is warranted for the diverted business opportunities because ICC has not submitted evidence that ICC mitigated these damages. Under New York law, a defendant bears the "burden to establish not only that plaintiff failed to make diligent efforts to mitigate its damages . . . , but also the extent to which such efforts would have diminished its damages." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 846 N.Y.S.2d 95, 99 (1st Dep't 2007); *accord Kane v. SDM Enters., Inc.*, 5 N.Y.S.3d 182, 184 (2d Dep't 2015). MasterCard's argument is rejected because it offers no evidence regarding the extent to which mitigation would have diminished the Diverted Business damages related to Quds Bank or the ATM operations. *See LaSalle Bank Nat'l Ass'n*, 846 N.Y.S.2d at 99.

Consequently, MasterCard's motion for summary judgment on ICC's claim for breach of contract is granted in part and denied in part.

**B. ICC's Damages Expert**

MasterCard's motion to exclude the report and testimony of ICC's damages expert, Pamela O'Neill, is granted in part and denied in part. O'Neill's report and testimony are no longer relevant, and therefore inadmissible, as to the categories of damages barred by the granting of summary judgment -- i.e., the Diverted Business damages that stem from lost business opportunities with other credit card companies, and with InvestBank and Jordan Commercial Bank. Her report and testimony are otherwise admissible.

O'Neill's opinions on the surviving damages claims are "relevant to the task at hand." *Amorgianos*, 303 F.3d at 265. Rule 401 provides that "[e]vidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. ICC's damages will be a key

issue at trial if ICC prevails on its claims. O'Neill's report, which values ICC's operations associated with the terminated licensing agreements and estimates ICC's resulting lost profits, is therefore relevant.

O'Neill's report and testimony meet the Rule 702 requirements for reliability. She is a witness "qualified as an expert by knowledge, skill, experience, training, or education" under Rule 702. Fed. R. Evid. 702. According to her report, she has an MBA from Lehigh University, was a Partner within Deloitte's Valuation practice and has spent more than 25 years as a valuation professional and has directed more than 800 valuation assignments. She uses reliable principles and methods for valuing ICC and calculating lost profits, namely, the discounted cash flow method and the guideline company method. *See, e.g.*, *In re Chemtura Corp.*, 439 B.R. 561, 573 (Bankr. S.D.N.Y. 2010) (noting that the guideline company and discounted cash flow method are "standard valuation methodologies").

O'Neill's opinions are also based on sufficient facts and data, and she reliably applied the valuation methodologies to the facts. To select comparable companies for the guideline company method, she researched publicly held companies that, like ICC, issued and acquired credit cards and those that processed payments. She also consulted ICC management and industry periodicals to identify comparable companies. For comparison, she reviewed ICC's financial statements for nine years. She also consulted the Duff & Phelps' Risk Premium Report 2013 to determine the appropriate adjustment before calculating the market multiple, and consulted the Mergerstat/BVR Control Premium Study Transaction Report to determine a control premium to be applied to the market multiple.

For the discounted cash flow method, which she stated corroborated the guideline company analysis for Base Business damages, she used a valuation report that had been prepared

11

by a third party appraiser that ICC's largest shareholder hired each year to estimate ICC's fair market value. After checking the reliability of historical projections against actual results, she relied on the 2013 report to obtain a five-year income projection. She calculated a discount rate of approximately 15%, which converts to a capitalization rate of 12%. By combining the value reached with each of these two approaches she calculated Base Business damages of $30.7 million.

She also applied the discounted cash flow method to calculate Diverted Business damages. For the opportunity with Quds Bank, she relied upon management projections through 2013, and beyond that relied on the revenue growth rate projection she had used for the Base Business. She applied the discount rate methodology developed for the base business and added a 12% risk in the cost of equity calculation to account for the lack of operating history.

MasterCard raises various objections. For the Base Business damages, MasterCard contends that O'Neill did not account for the alleged fact that ICC's largest asset was its cardholder receivables and that a majority of these receivables were owed by the Alami family. It further contends that O'Neill admitted at her deposition that $14 million in Alami family card balances should be deducted from ICC's damages calculations. This argument is rejected because O'Neill did not make this statement. She expressly testified that she did not consider the amount that the Alami family members owe to be relevant to ICC's value. To the extent MasterCard disputes her treatment of a particular asset, the argument may be pursued through cross-examination and presentation of a contrary opinion at trial. *See Amorgianos*, 303 F.3d at 267.

MasterCard also argues that O'Neill's discounted cash flow analysis to value the Base Business is unreliable because it is based on cash flow projections prepared by a third party --

i.e., the appraiser that ICC's largest shareholder commissioned annually. This argument is unavailing because "an expert may rely on data that she did not personally collect." *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000). The appraiser's projections have sufficient indicia of reliability. O'Neill explained that, because she had five years of reports from the appraiser, she was able to compare whether ICC's actual performance matched the report's projections for a given year. Because there was no gross mismatch, she concluded the valuation report's figures were reasonable. The appraiser's report also states that it used historical and prospective financial and operational information provided by ICC's management and other third parties, and that the appraiser reviewed the data for reasonableness. MasterCard does not argue that the data or projections in the report are unreasonable. That O'Neill used projections prepared by another party does not render her opinions based on those projections inadmissible. *See Gussack Realty Co.*, 224 F.3d at 94.

MasterCard also argues that O'Neill's guideline company method was unreliable because the comparable companies were too dissimilar to ICC. For instance, MasterCard contends that one of the fourteen comparators operated only in Japan, which has a different market than Jordan. These individual objections regarding specific characteristics of some of the 14 comparable companies, if anything, "fall[] into the category of 'minor errors' that do not require exclusion of expert testimony (if indeed they are errors at all)." *Buchwald v. Renco Grp.*, 539 B.R. 31, 47 (S.D.N.Y. 2015) (quoting *Amorgianos*, 303 F.3d at 267). In addition, O'Neill decreased the median guideline multiple by 15% to account for differences between ICC and the guideline companies. Whether this adjustment was adequate, or whether some of the comparable companies should have been omitted in the analysis is a proper subject for cross-examination. The issue does not so undermine the reliability of the opinion as to warrant

13

exclusion. *See, e.g.*, *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 176 (D.N.J. 2008) (rejecting the argument that guideline companies are too dissimilar, explaining that the defendant can "illustrate the differences between" the plaintiff and the guideline companies through cross-examination); *cf. In re Xerox Corp. Sec. Litig.*, 821 F. Supp. 2d 504, 509 (D. Conn. 2010) ("The selection of comparators will seldom approach the Utopian ideal of identifying the perfect clone and thus such criticisms go more to the weight afforded to [the expert's] analysis than to its admissibility." (internal quotation marks omitted)).

For the Diverted Business damages related to the ATM network, MasterCard argues that O'Neill's opinions are not adequately supported by the record. MasterCard contends that there is no evidence that ICC made any of the significant investments in technology and infrastructure that O'Neill assumes would have been necessary to launch an ATM network. This not an accurate characterization of O'Neill's report. O'Neill stated that ICC made a cash outlay for capital expenditures that corresponded with ICC purchasing fixed assets that were needed for the network. O'Neill also accounted for the possibility that the ATM network would not succeed by applying a risk-adjusted discount rate. MasterCard's argument regarding O'Neill's damages based on the ATM network is unavailing.

In sum, MasterCard's motion to exclude the testimony of O'Neill is granted to the extent it relates to categories of damages barred by the granting of summary judgment and is otherwise denied.

**C.     MasterCard's Experts Kaushik Gopal and Anthony Creamer**

**1. Kaushik Gopal**

ICC's motion to exclude Gopal's report and testimony is denied. First, Gopal's testimony regarding industry practice and custom with regard to payment card transaction

processing is relevant and helpful. Gopal's testimony will provide background information that will help the jury understand the workings of electronic card payment networks. *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 133 (2d Cir. 2006) (permitting expert testimony regarding "the customs and practices of the insurance industry"); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016) (permitting expert testimony that would "identify [a business's] practices and structures and place them within a larger context of industry norms"). Gopal's testimony will also assist the jury in deciding whether ICC materially breached the licensing agreements because it failed to make timely payments to merchants. "Whether a failure to perform constitutes a 'material breach' turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract." *Process Am., Inc. v. Cynergy Holdings*, *LLC*, 839 F.3d 125, 136 (2d Cir. 2016) (quoting *Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445, 450 n.9 (N.Y. 1974)). Gopal's testimony regarding industry custom and practice of payment acquirers, such as ICC, will assist the jury in understanding the "four-party payment system" which MasterCard employs, the importance of timely payment to merchants in such a system, the relative magnitude of the breach caused by any delay in payments and its effect on the four-party system. *See, e.g.*, *Antilles S.S. Co. v. Members of the Am. Hull Ins. Syndicate*, 733 F.2d 195, 199 (2d Cir. 1984) (evaluating an expert witness's testimony "concerning customs and practices of the marine insurance industry . . . as it bears on the intent of the parties"); *Mktg./Trademark Consultants, Inc. v. Caterpillar, Inc.*, No. 98 Civ. 2570, 2000 WL 744371, at *2 (S.D.N.Y. June 9, 2000) ("[E]xperts commonly testify on industry custom and practice in order to allow the jury to come to a conclusion concerning the conduct of parties to an agreement.").

Second, Gopal's testimony and report, which are based on his experience working in the payment card industry, are reliable. "[T]he expert must show why '[his or her] experience is a sufficient basis for [his or her] opinion.'" *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 463 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 advisory committee's notes). According to his report, Gopal has worked in the payment card industry for approximately 12 years. He spent almost five years at First Data, one of the world's largest processors and acquirers, where he managed its accounts in the Middle East. He currently works for MasterCard where he is responsible for MasterCard's regional processing business in the Middle East and Africa. He testified that at MasterCard and in his previous jobs, he has trained customers on four-party models, which included implementing a processing system for both issuers and acquirers in the Middle East. Gopal has sufficient experience in the payment card industry, particularly in the Middle East, to qualify him to render his opinions.

ICC objects that Gopal cannot be an expert because he is a MasterCard employee and his testimony will be unfairly prejudicial under Federal Rule of Evidence 403. Rule 403 permits a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." However, the mere fact that Gopal is an employee of a party "does not automatically disqualify him from rendering expert testimony." *Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009); *see also Knowledge Based Techs., Inc. v. Int'l Bus. Machines Corp.*, No. 96 Civ. 9461, 1998 WL 164791, at *1 (S.D.N.Y. Apr. 8, 1998) ("[C]ourts routinely permit expert testimony by parties, employees, and others with financial and other plain interests in the outcome of the litigation."). ICC's objections regarding Gopal's potential bias go to the weight, not the admissibility, of his testimony. *See Knowledge Based Techs.*, 1998 WL 164791, at *1.

ICC also argues that Gopal's opinion is unreliable because he accepted without further investigation fact witness testimony and documentary evidence that ICC had pervasive merchant payment delays. ICC emphasizes that Gopal failed to speak with any merchant directly or investigate the methodology underlying MasterCard's merchant survey. In assessing reliability, the question is whether "the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted). Here, evidence in the record is sufficient for a reasonable jury to conclude that ICC materially breached the governing agreements. *See Int'l Cards Co.*, 2016 WL 3039891, at *4. Gopal acted reasonably by relying on this evidence. ICC's objection that Gopal's assumptions "are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (quoting *Boucher*, 73 F.3d at 21); *see, e.g*, *Kemp v. CSX Transp., Inc.*, 993 F. Supp. 2d 197, 218 (N.D.N.Y. 2014) (rejecting argument that an expert "relied on representations and records provided to him by [a party's] counsel instead of conducting an independent review of the record"). Accordingly, ICC's motion as it relates to Gopal is denied.

    2. **Anthony Creamer**

ICC's motion to exclude Creamer's counterclaims damages report and testimony is denied. First, Creamer's counterclaims damages report and testimony are relevant. The counterclaim complaint alleges that ICC breached the operative licensing agreements by failing to make timely payments to merchants and misusing MasterCard's marks. Creamer calculates lost fees and out-of-pocket expenses that MasterCard incurred as a result of the breach. Assuming that these damages are recoverable under the governing agreements, Creamer's opinion would assist a jury in evaluating the extent of MasterCard's damages.

Second, Creamer's report and testimony are reliable. Creamer is qualified as an expert by education and experience. His report states that he is a Certified Public Accountant and Certified Fraud Examiner and Managing Director at Navigant Consulting, which specializes in litigation, dispute analysis and financial investigations services. He applied his accounting expertise to calculate damages. For instance, to calculate lost fees on ICC's issuing and acquiring activity, he used four years of data to calculate a compound annual growth rate for various transactions and applied this transaction-specific rate to estimate lost activity. Creamer's calculations were also based on sufficiently reliable data, including MasterCard's Quarterly Member Reports, which summarize cardholder and merchant activity based on data provided by individual member companies.

ICC argues that Creamer is unqualified because he has no expertise in the markets in Jordan. Creamer's analysis is not based on any claimed expertise in Jordan. ICC has not explained how Creamer's analysis and opinions are rendered categorically inapplicable because the company at issue operates in Jordan. *Cf. Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) ("[An] expert should not be required to satisfy an overly narrow test of his own qualifications." (internal quotation marks omitted)). ICC also claims that the report is flawed because it states that Creamer will apply an unspecified risk-adjusted discount rate at trial and Creamer has not detailed the risks on which he would base the discount rate. While ICC may challenge any risk-adjusted discount rate Creamer uses, the potential that such a rate may be flawed is not a basis to exclude his report and testimony at this stage. ICC's motion to exclude the testimony and report of Creamer is denied.

## IV. CONCLUSION

For the foregoing reasons, MasterCard's motion for summary judgment is GRANTED with respect to ICC's Additional Issuing/Acquiring Opportunities damages and ICC's Additional Third-Party Processing Opportunities damages related to InvestBank and Jordan Commercial Bank and DENIED in all other aspects. MasterCard's motion to exclude O'Neill's report and testimony is GRANTED with respect to the damages on which summary judgment has been granted and DENIED in all other aspects. ICC's motion to exclude MasterCard's the report and testimony of experts Gopal and Creamer is DENIED.

The Clerk of Court is directed to close the motions at Docket Numbers 147, 164 and 167.

Dated: November 29, 2016
New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**